IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

GREGORY LUCE and NICHOLAS
NEWMAN,

                       Plaintiffs,                         OPINION AND ORDER

     v.                                                14-cv-046-wmc

TOWN OF CAMPBELL, WISCONSIN and
TIM KELEMEN,

                       Defendants,

and

COMMUNITY INSURANCE CORPORATION,

                       Intervening Defendant,

     v.

TOWN OF CAMPBELL, WISCONSIN and
TIM KELEMEN,

                       Third-Party Defendants.
_____

       In this suit under 42 U.S.C. § 1983, plaintiffs Gregory Luce and Nicholas Newman challenge a Town of Campbell ordinance prohibiting signs, banners and other items from overpasses on Interstate 90 within the town limits. Plaintiffs contend that this new ordinance, which was adopted in October 2013, violates their First Amendment rights. In addition, Luce claims that defendant Tim Kelemen, then Chief of Police for the Town of Campbell, violated his right to petition without retaliation, invaded his privacy and committed civil identity theft. The Town's insurer, Community Insurance

Corporation, subsequently intervened, seeking a declaratory judgment that it has no duty to defend or cover the claims asserted against defendant Kelemen alone.

Each party has moved for summary judgment.  For the reasons explained more fully below, the court will grant the Town's and Kelemen's motions for summary judgment on plaintiffs' claims for violation of their rights to free speech and assemble under the First Amendment (dkt. ##60, 65), finding no genuine issue of material fact that the challenged ordinance constitutes a reasonable time, place and manner restriction.   As explained more fully below, the court will also grant intervening defendant CIC's motion for summary judgment (dkt. #70), finding that the claims asserted against Kelemen alone were all premised on his posting of internet comments about Luce and using Luce's personal identifying information to sign him up for unwanted websites.  Because these actions plainly fall outside the scope of Kelemen's employment, CIC has no duty to defend or cover them.

Finally, the court is inclined to grant judgment on Luce's remaining retaliation claim under the First Amendment asserted against Kelemen on the grounds that Kelemen was not acting under color of state law when he retaliated against Luce.  Because defendant did not directly assert this defense, however, the court will provide Luce with an opportunity to explain why judgment should not be entered in Kelemen's favor on this last federal claim.[1]  Fed. R. Civ. P. 56(f).

---

[1] If the court grants judgment to defendant Kelemen on the First Amendment retaliation claim asserted against him, the court will likely decline supplemental jurisdiction over plaintiff's remaining state law claims, and dismiss those claims without prejudice, although plaintiff is free to address why it should not do so as well.  *See Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) (explaining that it is "the well-established law

UNDISPUTED FACTS[2]

## I. The Parties

Plaintiff Gregory Luce is a resident of La Crosse County, Wisconsin.  For some time, Luce has been involved with the La Crosse Tea Party -- a group of individuals who share common political beliefs, including a desire for lower taxes and limited government. In keeping with his religious beliefs as a practicing Catholic, Luce also actively opposes abortion, including President Obama's position on abortion.  Particularly relevant to this lawsuit, Luce participates in protests against abortion and President Obama's policies on the pedestrian overpass that spans Interstate 90 in the Town of Campbell.  Plaintiff Nicholas Newman is also a resident of La Crosse County and involved with the La Crosse Tea Party.  Like Luce, Newman protested with signs and banners on the pedestrian overpass, and wishes to do so in the future.

The Town of Campbell is located in western Wisconsin near the Mississippi River, just north of La Crosse.  Defendant Tim Kelemen was the Chief of Police for the Town when it passed Ordinance 9.12 and during all times relevant to this action.  Kelemen has since resigned from his position as Chief of Police and is no longer employed by the Town.

Intervenor defendant Community Insurance Corporation ("CIC") issued a public entity liability insurance policy to the Town of Campbell covering the time relevant to

_____

of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial").

[2] For purposes of summary judgment, the court finds the following facts to be material and undisputed except as otherwise noted.

this lawsuit.  The Town and Kelemen tendered their defense of the claims asserted in plaintiffs' complaint to CIC, seeking insurance coverage.  CIC accepted the defense for both defendants, but now seeks a declaratory judgment that it has no duty to defend or cover Kelemen for any of the claims asserted against him.

## II. Facts Relevant to Plaintiffs' First Amendment Claim

### A. Interstate 90 and Overpasses in the Town of Campbell

Interstate 90 passes through the Town of Campbell just east of the Wisconsin-Minnesota state line.  There are two vehicular overpasses and one pedestrian overpass above Interstate 90 within the town's limits.  The pedestrian overpass connects Bainbridge Street and stretches over I-90, as illustrated below:



(Declaration of Scott Johnson, Ex. 1 (dkt. #62-1) 1.)  As reflected in the picture, this overpass is located near traffic lanes exiting and merging from Dawson Avenue, as shown by the third lane in both directions of traffic.  The two vehicular overpasses are similarly located in areas where traffic is merging onto and/or off of Interstate 90.

A 2008 traffic study shows that between 23,100 and 29,500 vehicles travel on Interstate 90 running through Campbell on a daily basis.  During his employment with the Town, Kelemen responded to numerous traffic accidents on this stretch of I-90, and classified it as a significant risk area given the volume of traffic and frequency of accidents.  For their part, plaintiffs view this same traffic flow below the overpasses as a "unique opportunity to share their message to both a local audience and an out-of-state audience."  (Pls.' Reply to Pls.' PFOFs (dkt. #101) ¶ 24.)  Plaintiffs also dispute the assertion that this stretch of interstate has a "high accident rate." (Pls.' Resp. to Campbell's PFOFs (dkt. #89) ¶ 33.)

The Town of Campbell has never permitted advertisements to be displayed from an overpass, though plaintiffs point out that there is a Days Inn sign located 101.5 feet from the Bainbridge pedestrian overpass.[3]

### B.  Protest Activities

On August 6, August 17, September 11, and September 24, 2013, protests occurred on the pedestrian overpass.[4]  Defendants submitted photographs and a video of

---

[3] The Town also bars billboards in the Town of Campbell, including flashing signs or signs with moving parts.  (Campbell's PFOFs (dkt. #64) ¶ 121.)

one of the protests.  (Declaration of Justin H. Lessner, Exs. 1-5. (dkt. ##63-1 to 63-5).)

These exhibits show people standing on the overpass holding or otherwise affixing large

"IMPEACH OBAMA" signs, other small signs stating "HONK TO IMPEACH OBAMA,"

and American flags.  In the video taken from the La Crosse Tea Party website, vehicles

can be heard honking their horn as they pass under the signs and other displays.  (Pls.'

Resp. to Campbell's PFOFs (dkt. #89) ¶¶ 130, 149.)

### C. Justification for Sign Ordinance

As Chief of Police at that time, Kelemen personally witnessed these protests and

observed traffic slowing and braking in response to the signs, banners, and other items

displayed on the overpass.  He also observed vehicles pulling over onto the shoulder of

Interstate 90 to take photographs and observe the signs.  In addition, Kelemen received

several phone calls from residents and travelling motorists complaining about traffic

safety issues caused by these protests.[5]  In particular, individuals complained that drivers

had to slam on their brakes at or near the overpass.

At some point, Kelemen advised Scott Johnson, the Chairperson of the Town's

Board, of the need to take action to prevent traffic accidents caused by the signs, as well

---

[4] Kelemen also mentions a protest on December 7, 2013, which post-dates the enactment of Ordinance 9.12.

[5] Plaintiffs dispute that the Town's Police Department received phone calls expressing concerns for traffic safety because "[t]here is no record to support this statement."  (Pls.' Resp. to Campbell's PFOFs (dkt. #89) ¶¶ 74-75.)  Plaintiffs, however, fail to point to any records requirement.  Moreover, there is no dispute that Kelemen reported receiving such complaints to Johnson and other town officials.

as other items displayed during the protests on the pedestrian overpass. Kelemen believed the overpass sign ordinance was needed to protect traffic safety based on his training, experience, and his personal observations of the overpass protests. Kelemen also discussed traffic conditions on Interstate 90 in Campbell with several Wisconsin State Patrol officers, who informed him that it is a dangerous area. Kelemen further researched sign ordinances passed by other municipalities, including the City of Madison, Wisconsin's ordinance that was previously challenged in court.[6]

In addition, Kelemen learned of traffic incidents caused by similar overpass protests in other parts of the country. According to Plaintiffs, however, "[t]hese incidents occurred in significantly different traffic environments than what is present in the Town of Campbell." (Pls.' Resp. to Campbell's PFOFs (dkt. #89) ¶ 89.) Still, there is no dispute that these other traffic incidents were caused by similar overpass protests.

In evaluating the need for an overpass sign ordinance, Chairperson Johnson relied on the history of the overpass, Kelemen's concern about safety issues created by overpass signs, the number of accidents that had occurred on Interstate 90 in Campbell, and personal experiences in driving Interstate 90. Johnson personally drives Interstate 90 on nearly a daily basis. Moreover, Johnson received traffic safety training through his employer, Waste Management, which included information on the risks of distracted driving. While plaintiffs dispute whether Johnson's training experience qualifies him as

---

[6] *See Ovadal v. City of Madison*, 469 F.3d 625 (7th Cir. 2006). Plaintiffs dispute that Ordinance 9.12 and the ordinance adopted by the City of Madison are similar because "each addresses different overpasses and traffic patterns." (Pls.' Resp. to Campbell's PFOFs (dkt. #89) ¶¶ 85-86.) It is undisputed, however, that both Ordinance 9.12 and the City of Madison's ordinance prohibit individuals from displaying signs on overpasses.

an "expert in traffic safety," (Pls.' Resp. to Campbell's PFOFs (dkt. #89) ¶¶ 31, 90), it is not disputed that Johnson had training in traffic safety, nor that he relied on that and other personal experience in evaluating the necessity for an overpass sign ordinance.

### D. Ordinance 9.12

On September 10, 2013, a proposed ordinance was read into the record at a Town of Campbell Board of Supervisors' meeting and opened for public comment. After the Board introduced the proposed ordinance, members of the public were allowed to speak at the September 10th meeting. Among others, Luce spoke against enactment of the overpass sign ordinance. After the meeting, each member of the Town's Board individually spoke with the Town's attorney regarding the overpass sign ordinance. Then, on October 8, 2013, the Town's Board again discussed the proposed ordinance. At that meeting, the Town's Board voted 4 to 1 to approve the Ordinance.

The Ordinance provides in pertinent part:

> No person shall display, place, erect, post, maintain, install, affix, or carry any sign, flags, banners, pennants, streamers, balloons or any other similar item:
>
> (1) on any portion of a vehicular or pedestrian bridge or overpass that passes over a freeway or expressway as defined in WIS. STAT. § 346.57, or a controlled access highway as defined in WIS. STAT. § 990.01, when such highway has a speed limit of more than 40 miles per hour, whether the highway is under the jurisdiction of the federal, state or local government, provided that such sign is visible from such freeway, expressway or controlled access highway.
>
> (2) within one hundred (100) feet of any portion of a vehicular or pedestrian bridge or overpass that passes over a freeway or expressway as defined in WIS. STAT. § 346.57, or a controlled access highway as defined in WIS. STAT. §

8

> 990.01, when such highway has speed limit of more than 40 miles per hour, whether the highway is under the jurisdiction of the federal, state or local government, provided that such sign is visible from such freeway, expressway or controlled access highway.

(Campbell's PFOFs (dkt. #64) ¶ 113.)  As written, Ordinance 9.12 currently only applies to Interstate 90, as the only highway in Campbell that has a speed limit over 40 miles per hour.

### E.  Impact of Ordinance on Plaintiffs' Protest Activities

On October 24, 2013, Luce and other protestors assembled at one of the overpasses on Interstate 90 in Campbell with t-shirts that collectively spelled out "IMPEACH" on the front and "OBAMA" on the back.  Officer Zachary Fronk responded to the overpass and advised the group that their t-shirts violated Ordinance 9.12.  When asked why t-shirts posed a problem, Fronk responded that the shirts collectively formed a sign.  Rather than receive a citation, Luce and the others left the protest area.  The demonstrators videotaped this encounter with Campbell police.  (Declaration of Erin Kuenzig ("Kuenzig Decl."), Ex. 2 (dkt. #78-2).)

On October 27, 2013, plaintiff Newman became the first individual to receive a citation for violating Ordinance 9.12.  On the overpass that day, Newman unfurled a United States flag, making it visible to traffic below.  Kelemen then issued Newman a citation for displaying the flag on the overpass.  The encounter between Newman and Kelemen also was videotaped by Newman and uploaded to YouTube.  (Kuenzig Decl., Ex. 9 (dkt. #78-9).)

On November 3, 2013, Luce was planning to demonstrate his anti-abortion views at a potential site within 100 feet of a Campbell Overpass, which could be seen by those driving on Interstate 90.  Ultimately, he did not protest at this site because of the threat of enforcement of Ordinance 9.12.

Officers Casper and Kelemen responded to another overpass protest on December 7, 2013.  This time, Casper and Kelemen issued a total of four citations, though they found "numerous people violating the overpass sign ordinance with multiple signs, banners, flags, pennants and balloons being displayed from the overpass."  (Pls.' Resp. to Campbell's PFOFs (dkt. #89) ¶ 136.)  Luce was among the protestors on the overpass on December 7, and he received a citation.

### III. Facts Relevant to Luce's Claims against Kelemen

Beginning on or about January 12, 2014, plaintiff Luce received approximately fifteen phone calls from individuals regarding profiles and accounts created in his name on various dating websites for gay men, gay pornography websites, and the federal government's healthcare website, among others.[7]  (Pls.' PFOF (dkt. #76) ¶ 123.)  Luce contacted the La Crosse Police Department, fearing that he was a victim of identity theft.

Kelemen eventually admitted to officers from the La Crosse Police Department and the Monroe Police Department that *he* had signed Luce up for online memberships and solicitations on three different occasions in early 2014 -- January 12, January 16, and

---

[7] Examples of some of these unwanted websites are: Match.com, Menschatlive.com, Gaybeardating.com, ABC's The Bachelor, Simplygaydvd.com, Simplygaydvd.com, Cybersocket.com, Dirty Deeds Newsletter, Gaygourney.com, Xhamster.com, Imagefap.com, Justwatchporn.com.  (CIC's PFOFs (dkt. #72) ¶ 37.)

March 5.[8]  In short, Kelemen admits that his actions were motivated by revenge against Luce for the upsetting emails and phone calls the Campbell Police Department had received regarding Ordinance 9.12, citing Luce's videotaping of their interactions and posting of the same videos on YouTube.  As Kelemen stated to officers, "It's just like, you know, you want to mess with us, because we were getting messed with, we'll mess with you."  (Pls.' Reply to Def. Kelemen's Resp. to Pls.' PFOF (dkt. #103) ¶ 139.)[9]

In signing up Luce for internet solicitations, memberships, and dating websites, Kelemen used a computer owned by the Town of Campbell.  Creating these accounts required Kelemen to input Luce's name, email address, and phone number.  According to Kelemen, he obtained all of this information, through publicly-available websites, including the Tea Party website, La Crosse County Land Records and the Wisconsin Circuit Court Access.  "Kelemen did not use any confidential or law enforcement means to obtain Luce's email addresses."  (Kelemen's PFOFs (dkt. #68) ¶ 23 (citing Affidavit of Timothy Kelemen ("Kelemen Aff.") (dkt. #67) ¶ 15).)  On the other hand, Kelemen was on duty during at least some of the occasions when he acquired and used Luce's personal information to sign him up for unwanted websites.

---

[8] The first two dates precede the filing of this lawsuit; the last date, however, does not. Kelemen acknowledges that he became aware of this lawsuit by mid-February.  The proof of service represents that Kelemen was served on February 4, 2014, a full month before his last admitted malicious impersonation of Luce online.  (Dkt. #17.)

[9] Not that it justifies or otherwise diminishes Kelemen's outrageous response to these emails and calls, Kelemen represents that the calls inundated the police department to the point that it impacted call forwarding to the 24-hour emergency dispatch center. (Kelemen's PFOFs (dkt. #106) ¶ 20.)  The police department also received an email stating that Officer Nathan Casper should be shot in the head or face because he issued citations for the violation of the Ordinance.  (City's PFOFs (dkt. #64) ¶ 159.)

Kelemen also posted several comments under the name "Bill O'Reilly" on the La Crosse Tribune's website, mentioning Luce by name in each post.  On January 14, 2014, Kelemen posted Luce's home address and stated that Luce had not paid his property taxes.  On January 23, Kelemen also posted a comment that Luce may have been "Tea Partying" too much.  (Pls.' Reply to Def. Kelemen's Resp. to Pls.' PFOF (dkt. #103) ¶ 154.)   Kelemen again posted on January 23, stating that "Greggie disrespected the wrong" person.  (*Id.* at ¶ 155.)   Finally, on January 24, Kelemen posted a comment stating that Luce's car would be repossessed because Luce's payments "bounced." (*Id.* at ¶ 156.)

After the Monroe County Sheriff's department concluded its investigation, Kelemen was charged with Unlawful Use of a Computerized Communication System in violation of Wis. Stat. § 947.0125(2)(e), to which he pled no contest and entered into a diversion agreement.   After Kelemen's conduct came to light, he was placed on administrative leave and eventually resigned.

## IV.  Additional Facts Relevant to Intervenor CIC's Declaratory Judgment Claim

### A.  Insurance Policy

CIC issued a policy of insurance to the Town of Campbell, covering bodily injury and property damage, personal injury, and errors and omissions.  (Affidavit of David G. Bisek ("Bisek Aff."), Ex. A (dkt. #36-1) p.14.)   The policy defines "insured" in relevant part as

> *Your* past or present employees or elected or appointed officials while acting within the scope of their employment or authority, and authorized volunteers while acting for *you* or

12

> on *your* behalf, including all commissions, agencies boards, districts, authorities or similar entities when *you* retain the right to control the details of the work of these individuals or entities . . . .

(*Id.* at p.15.)

Coverage under the personal injury and errors or omissions policy excludes coverage for "intentional or knowing violation of a penal statute."  (*Id.* at p.5 (listing exclusions under "personal injury" coverage; *id.* at p.6 (listing exclusion of "willful violation of penal code" under "errors and omissions coverage").)

### B.  Scope of Kelemen's Employment

Kelemen described his duties as police chief to include responsibilities involving writing the budget for the police department, maintaining the budget throughout the year, supervising four officers, and upholding the laws and ordinances of the States of Wisconsin and any municipal ordinances that were on file within his jurisdiction.

The Town's Employee Policy and Procedure Manual provides in pertinent part that the Town "expects its employees to conduct business in accordance with the letter, spirit and intent of all relevant laws and should refrain from any illegal, dishonest or unethical conduct."  (Affidavit of Michelle M. Ford ("Ford Aff."), Ex. A (dkt. #73-1) p.8.)  Moreover, the manual provides that "[e]mployees of the town shall use . . . equipment [and] property . . . to transact or perform the business of the town exclusively and for no other purpose."  (*Id.*)  Specific to computers, the manual further provides that "the town prohibits the use of computers and email in ways that are disruptive, offensive to others, or harmful to moral."  (*Id.* at p.9.)  The Town's Ethics Ordinance No. 8-98

13

further provides that "covered personnel must act impartially and responsibly, in obedience of all applicable laws, rules and regulations, in a manner that will promote public confidence and within their scope of authority."  (*Id.* at p.7.)

At his deposition, Kelemen admitted the obvious -- that in signing Luce up for websites he was not enforcing any laws or otherwise engaging in legitimate law enforcement activity.  (CIC's PFOFs (dkt. #72) ¶¶ 41-42 (citing 12/19/14 Deposition of Timothy R. Kelemen ("12/19/14 Kelemen Depo.") 202-03).)


## OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Factual disputes preclude summary judgment only if the "facts might affect the outcome of the suit under the governing law."  *Id.* at 248.

The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact and that it is entitled to relief.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  For any issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).  In that situation, it is not enough for the

nonmoving party to "simply show some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Nor may the nonmoving party "merely rely on conclusory pleadings" to withstand the motion. *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987). Instead, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

## I. Plaintiffs' First Amendment Claims

Plaintiffs contend, and defendants do not dispute, that their protests and other activities on the overpass constitute expressive activity. *See, e.g.*, *United States v. Grace*, 461 U.S. 171, 176 (1983) ("There is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment."). There is also no dispute that the overpass is a traditional public forum. *Ovadal v. City of Madison, Wis.*, 416 F.3d 531, 536 (7th Cir. 2005) (holding that a pedestrian overpass constitutes a traditional public forum). Accordingly, plaintiffs' First Amendment claims turn on whether Ordinance 9.12 is a constitutional time, place and manner restriction.[10]

---

[10] Plaintiffs' right to assemble claim similarly turns on whether the ordinance is a permissible time, place and manner restriction. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577-78, (1980) (recognizing the right to assemble in public places, including "streets, sidewalks, and parks," is "[s]ubject to the traditional time, place, and manner restrictions").

15

A municipality may enforce regulations of the time, place, and manner of expression which (1) are content-neutral, (2) are narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels of communication. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).   The Town bears the burden of establishing that the time, place and manner restrictions set forth in Ordinance 9.12 meet these three requirements.   *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000).  The court will consider each requirement in turn.[11]

## A. Content Neutral

Plaintiffs acknowledge that Ordinance 9.12 is content-neutral; and for good reason, the ordinance "makes no reference to the content of speech" and "is wholly indifferent to any specific message or viewpoint."  *Weinberg v. City of Chi.*, 310 F.3d 1029, 1038 (7th Cir. 2002); *see also Ovadal*, 416 F.3d at 537 ("If the city had a policy that prohibited not just Ovadal's, but all protests and all signs on all Beltline overpasses, this could certainly be a legitimate place and manner restriction because it would be clearly

---

[11] Defendant Kelemen adopts the arguments made by the Town, although plaintiffs fail to explain how Kelemen should be liable for the Town's enactment of the ordinance. While it is undisputed that Kelemen proposed the ordinance, plaintiffs fail to develop any argument or cite to any case law in support of their presumed theory that an individual without the authority to enact legislation nonetheless should be liable for that enactment.  To the extent that plaintiffs' claim is premised on some theory that the Town Board was under Kelemen's control under a "cat's paw" theory, the Seventh Circuit has questioned the application of this theory in the § 1983 context.  *See Waters v. City of Chi.*, 580 F.3d 575, 586 (7th Cir. 2009).

content-neutral.").[12]   "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it had an incidental effect on some speakers or messages but not others."  *Ward*, 491 U.S. at 791; *see also DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 829 (7th Cir. 1999) ("[I]n analyzing whether Hallie's ordinance violates the First Amendment, we do not ask whether the motives of the Board can be justified as content-neutral time, place, and manner restrictions, but rather whether the ordinance itself can be so justified.").  Here, Ordinance 9.12 is content-neutral.[13]

## B.  Narrowly Tailored to Serve a Significant Government Interest

Plaintiffs do not dispute that traffic safety constitutes a significant government interest, nor could they do so now at this late date.  *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981) (describing "traffic safety" as a "substantial

---

[12] Plaintiffs assert that Ordinance 9.12 has only been enforced against Tea Party members seeking to express their views on overpasses.  (Pls.' Reply to Def. Kelemen's Resp. to Pls.' PFOF (dkt. #103) ¶ 113.)  However, plaintiffs fail to submit any evidence that other individuals or groups have violated the Ordinance, much less done so without consequence.  Without this evidence, an as applied challenge lacks merit.  To the extent plaintiffs are hinting at a claim premised on the Town's adoption of the Ordinance based on an improper motive, the court must reject this argument "rather easily" as well.  *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 828 (7th Cir. 1999).  At least in the First Amendment context, the court will "not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."  *United States v. O'Brien*, 391 U.S. 367, 383 (1968).  As such, "[t]he actual motives of those who enacted the ordinance are irrelevant to [the court's] First Amendment analysis."  *DiMa Corp.*, 185 F.3d at 828.

[13] Not only is there no claim by plaintiffs that then-Chief Kelemen manipulated the Town Board into his "cat's paw" for some sanctionable reason, but there is *no evidence*. First, as set forth above, the board members relied on their own, separately gathered evidence and observations.  Second, even Kelemen's desire to lash out came later, and was essentially content neutral.

governmental goal[]").    Thus, this second requirement is met if Ordinance 9.12 is narrowly tailored to further that interest.

"A regulation is narrowly tailored if it 'promotes a substantial government interest that would be achieved less effectively absent the regulation.'"  *Weinberg*, 310 F.3d at 1040 (quoting *Ward*, 491 U.S. at 799).  "To satisfy the narrowly tailored test, an ordinance need not be the least restrictive method for achieving the government's goal."  *Id.*  While the Town cannot "blindly invoke safety and congestion concerns without more," *Weinberg*, 310 F.3d at 1038, the burden to put forth evidence supporting a speech restriction is "not overwhelming," *DiMa Corp.*, 185 F.3d at 829.  Accordingly, "[t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses."  *Id.* (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986)).

Plaintiffs assert that the Town's claim of traffic safety concerns is "merely conjectural."  *Turner Broad.*, 512 U.S. at 665 ("When the Government defends a regulation on speech as a means to . . . prevent anticipated harms, . . . [i]t must demonstrate that the recited harms are real, not merely conjectural.").  Specifically, plaintiffs argue that the Town "provides only speculation and personal opinion to support" Ordinance 9.12, which is insufficient to justify the necessity for it.  (Pls.' Opp'n to Campbell's Mot. (dkt. #88) 5.)  Plaintiffs also cite testimony from their expert, Dr. Paul Dorothy, who investigated traffic flow and the overpasses in Campbell.  While

18

plaintiffs claim this evidence proves that the Town's representatives wrongly concluded that protests on the overpasses created traffic concerns, whether the Town was right or wrong in its conclusion is not the proper question.

The Town "may rely upon any evidence that is '*reasonably believed* to be relevant' for demonstrating a connection between speech and a substantial, independent government interest." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438-39 (2002) (quoting *City of Renton*, 475 U.S. at 51-52) (emphasis added). Indeed, the Town may justify Ordinance 9.12 "based solely on history, consensus, and simple common sense." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001).

The Town has presented evidence that it relied on shared experiences driving on Interstate 90, conversations with Wisconsin State Patrol officers, reports of complaints from drivers who were on the Interstate during plaintiffs' protests, and traffic incidents caused by similar overpass protests in other parts of the country. Moreover, the Town had information from a prior study that estimated between 23,100 and 29,500 vehicles drive daily on Interstate 90 through Campbell, where the speed limit is 65 miles per hour.

Whether or not this is a high volume of traffic compared to other sections of Interstate 90, the Town's representatives were entitled to rely on their personal experience and common sense to determine that protesting on overpasses above the Interstate was potentially distracting to drivers. The decision to enact Ordinance 9.12 is further supported by the evidence of cars braking near the overpass during protests, horns honking at protestors, complaints of drivers, the presence of on and off ramps at or

near the overpasses, and evidence of drivers pulling over to the side of the Interstate to photograph the protests.[14]   At minimum, this evidence demonstrates that the Town has done more than "blindly invoke safety . . . concerns without more."  *Weinberg*, 310 F.3d at 1038.

Whatever plaintiff's expert Dr. Dorothy's after-the-fact testimony may be on the safety risks, it is "irrelevant to the question of whether there is some evidence that does support the [Town's] conclusions."  *Dima Corp.*, 185 F.3d at 831.   Certainly, this "contradictory evidence would be highly probative if [the court's] task were to discover the objective truth about the effect of [plaintiffs' protests on traffic in Campbell]."  *Id.*  As already explained, however, the court's inquiry under the First Amendment is "far different."  *Id.*

Plaintiffs also argue that Ordinance 9.12 is not narrowly tailored because it prohibits speech within 100 feet of overpasses.   To support their argument, plaintiffs point to a Days Inn sign that is 101.5 feet from the pedestrian overpass.   Further, plaintiffs again call upon their expert, Dr. Dorothy, who determined that the 100 foot restriction was "arbitrary and capricious" due to a lack of "engineering justification" for the distance.  (Pls.' Opp'n to Campbell's Mot. (dkt. #88) 12.)

While it is somewhat concerning that the Town and its board members cannot articulate a basis for imposing a 100-foot restriction, as opposed to, say, a 30-foot restriction.   In general, however, some distance needed to be adopted to realize the traffic

---

[14] Indeed, plaintiffs' video recordings of the protests showing passing cars honking their horns in reaction bolster the Town's concern that drivers were being distracted at the time of the Ordinance's passage.

safety goals underlying Ordinance 9.12.  The fact that this distance treated the protesters as it did Days Inn is both content neutral and imminently reasonable.[15]

Moreover, under the standard of review governing this case, the Ordinance "need not be the least restrictive" means of serving the Town's interests.  *Ward*, 491 U.S. at 798-99 ("So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.").  The Town sought to limit traffic safety concerns associated with protesting above fast-moving traffic.  There is a "reasonable fit" between the Town's goal and the 100-foot limitation.  *See Lorillard*, 533 U.S. at 554 (holding that restrictions on speech withstand scrutiny where there is a "reasonable fit" between the regulation and stated goals).

### C. Ample Alternative Means of Communication

Finally, plaintiffs contend that the Ordinance leaves them "with no reasonable alternative means to reach their intended audience."  (Pls.' Resp. Br. (dkt. #88) 15.)  The court credits plaintiffs' contention that the pedestrian overpass provides access to a high-traffic area of individuals travelling through Campbell, but just as the content-neutral regulation of speech need not be the least restrictive possible, "an adequate alternative does not have to be the speaker's first or best choice, or one that provides the same

---

[15] Of course, the Days Inn sign is likely elevated and, therefore, more visible from the highway.  At the same time, a simple hotel sign is likely less distracting than a protest.

audience or impact for the speech."[16] *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000).  Rather, the regulation will stand unless an entire medium of public expression across a particular community has been foreclosed.  *See Hill*, 530 U.S. at 726.

Here, Ordinance 9.12 does not ban plaintiffs' protests or speech.  It only prevents them from protesting on or within 100 feet of overpasses with items visible to high speed drivers below.  For example, plaintiffs may "go door-to-door to proselytize their views [and] may distribute literature in this manner . . . or through the mails." *Frisby v. Schultz*, 487 U.S. 474, 484 (1988).  Additionally, they may contact their intended audience by telephone, speak at public meetings, place messages on cars, or use local media.  *Id.* Perhaps an even more intriguing alternative channel to plaintiffs is the continued use of YouTube to broadcast their speech to Internet users around the world.  (Kuenzig Decl., Exs. 2, 9 (dkt. ##78-2, 78-9).)[17]  In short, Ordinance 9.12 "permits the more general dissemination of [plaintiffs'] message" in Campbell.  *Id.*

In addition to using other modes of communication, plaintiffs can also display signs and banners in public parks, near other roadways, and other property outside of the 100-feet area surrounding Interstate 90, including one would suppose at the end of the on and off ramps, where traffic would have slowed.  While these options may be less

---

[16] Curiously, at his deposition, Luce disclaimed that he was attempting to attract the attention of motorists when he displayed signs from the overpass.  (Campbell's PFOFs (dkt. #64) ¶ 61 (citing Deposition of Gregory Luce ("Luce Depo.") (dkt. #50) 44.)

[17] *See also* "Town of Campbell WI Police Write Citations For Displaying US Flag," available at https://www.youtube.com/watch?v=DPmSgMTXiqo; "Town of Campbell WI Police Issue Citation For Holding A Cross!," available at https://www.youtube.com/watch?v=zUVeEIFpYwE.

desirable for plaintiffs because of their more limited access to an audience, "[s]o long as the amount of speech left open is ample, it is not fatal that the regulation diminishes the total quantity of speech." *City of Watseka v. Ill. Public Action Council*, 796 F.2d 1547, 1553 (7th Cir. 1986).

For all of these reasons, the court finds as a matter of law that Ordinance 9.12 is a constitutional time, place, and manner regulation of speech. Therefore, the court will grant the Town's and Kelemen's respective motions for summary judgment on plaintiffs' first and second causes of action, and in turn deny plaintiffs' motion on those same claims

## II. Luce's Claims against Kelemen

Luce asserts three claims against Kelemen, all relating to his admitted posting of comments about Luce on the internet and using Luce's personal identifying information on the internet to enroll him in various web-sites. (Am. Compl. (dkt. #28) ¶ 89 (First Amendment retaliation claim); ¶¶ 94-95 (Wis. Stat. § 995.50(2)(a) claim); ¶ 103 (Wis. Stat. §§ 932.201, 895.446 claim).) Luce's First Amendment retaliation claim is pursued under 42 U.S.C. § 1983, while the other two state law claims are before the court on pendent jurisdiction. To state a claim under § 1983, a plaintiff must establish that the defendant acted under color of state law, among other requirements. *Cruz v. Safford*, 579 F.3d 840, 843 (7th Cir. 2009).

The parties failed to address this threshold issue, though the parties' discussion of whether Luce was required to abide by the notice requirement in Wis. Stat. § 893.80 before bringing certain claim against government bodies or officials highlights a closely

23

related issue of whether Kelemen was acting under color of state law at all.  Whether an individual acts under color of state law turns on another question:  whether "the official was exercising state or local authority, or acting only as a private individual."  1A Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 5/05[A] (4th ed. 2014).

Importantly, one can abuse his or her authority, but still act under color of state law:  "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *Monroe v. Pape*, 365 U.S. 167, 184 (1961); *see also West v. Atkins*, 487 U.S. 42, 49-50 (1988) ("It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State"); *Honaker v. Smith*, 256 F.3d 477, 484-85 (7th Cir. 2001) (explaining that action is taken under color of state law "when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law").

Even so, a misuse of power necessarily involves *use* of power possessed by virtue of state law, and the facts before this court on summary judgment demonstrate that Kelemen was not using his power as the police chief in allegedly taking retaliatory actions against Luce in response to his vigorous opposition of Ordinance 9.12.  Cases in which courts have found that the § 1983 defendant acted under color of state law involve either:  (1) the defendant's express or implied invocation of state authority; or (2) instances where the defendant could not have acted in violation of the plaintiff's constitutional rights but for his state authority.  Neither of these two instances is at play here.

24

*First*, Kelemen's acts of enrolling Luce in the above-described websites and posting comments about him online were done anonymously. There is no evidence Kelemen used or displayed his police power or otherwise invoked his authority in carrying out these actions. In *Latuszkin v. City of Chicago*, 250 F.3d 502, 503, 505-06 (7th Cir. 2001), the Seventh Circuit affirmed a dismissal of a § 1983 lawsuit against an off-duty police officer driving under the influence of alcohol, who struck and killed the plaintiff's wife. The court explained that in determining whether the officer acted under color of state law "[t]he important consideration . . . is the nature of the specific acts performed." *Id.* at 505-06. In that case, the defendant officer "was not engaged in police activity," had not "displayed any police power," nor had he "possessed any indicia of his office at the time of the accident." *Id.* at 506. Instead, the officer was "engaged in entirely private behavior at the time of the accident." *Id.* So, too, here. Kelemen in no way displayed his police power -- either expressly or implicitly -- in engaging in the alleged retaliatory acts. To the contrary, Kelemen attempted to *hide* his identity as the police chief.

*Second*, there is no evidence Kelemen used his authority, either to gain the necessary personal information to sign Luce up for websites or to comment on online forums. Instead, the evidence shows that Kelemen accessed Luce's personal information from publicly available websites, or at least plaintiff has failed to raise a genuine issue of material fact even suggesting otherwise. Importantly, this is not a case where the defendant was only able to violate the plaintiff's rights because of his state authority. *See, e.g.*, *Wudtke v. Davel*, 128 F.3d 1057, 1064 (7th Cir. 1997) (finding school superintendent who sexually assaulted teacher and threatened to disapprove her renewal

of her teacher's license if she did not engage in sexual acts with him, acted under color of state law by "explicit invocation of his state-granted powers").  Put another way, any private citizen could have engaged in Kelemen's admitted acts.  *Carlos v. Santos*, 123 F.3d 61, 65 (2d Cir. 1997) ("Any citizen may perform these acts:  they were not made possible only because" the town board members were clothed with official authority.).

On this record, plaintiff can only point to Kelemen's use of a police department computer in sending certain of his electronic messages.  That is not enough.  Cases in which courts have relied on the defendant's use of public resources involve access to information peculiar to that position.  *See, e.g.*, *McDade v. West*, 223 F.3d 1135, 1140 (9th Cir. 2000) (holding that an employee of the district attorney's office acted under color of state law when the employee illegally used the district attorney's office's computer database to access information); *Haines v. Fisher*, 82 F.3d 1503, 1505-06 (10th Cir. 1996) (finding officers acted outside of the scope of § 1983 when they staged a robbery as a prank, even though the officers used the town's M16 automatic rifle and drove to the 7-Eleven in a police car belonging to the town).  Indeed, the *Haines* case presents a much closer fact pattern than the case at issue here.

Nor is it enough that the purported reasoning or motivation for taking certain actions (however misguided) comes from the defendant's public employment.  For example, in *Wilson v. Price*, 624 F.3d 389 (7th Cir. 2010), after receiving several complaints about cars parked illegally in front of a repair shop, the defendant alderperson drove to the shop, demanded that the cars be moved, and after an employee refused his order, beat the plaintiff employee until he was unconscious.  *Id*. at 390.  The Seventh

26

Circuit determined that while he was arguably acting under color of state law when he went to the repair shop to investigate the complaints, "it is indisputable that Price crossed that line and entered the realm of law enforcement—which is wholly unrelated to the duties of a legislator—the moment he demanded that Wilson move the cars." *Id.* at 393.

On the undisputed record, therefore, defendant Kelemen appears entitled to summary judgment in his favor on plaintiffs' § 1983 claim, which requires that he be acting under color of state law.  Because this issue was not raised expressly by defendant, however, the court will provide plaintiff ten days to identify any facts of record supporting a finding that Kelemen was acting under color of state law.

The court will also reserve on the parties' cross motions for summary judgment on Luce's state law claims against defendant Kelemen.  If the court, as anticipated, grants summary judgment to Kelemen on plaintiff's First Amendment retaliation claim -- on an issue not material to plaintiff's state law claims -- the court will likely decline to exercise its supplemental jurisdiction over the state law claims and will dismiss them without prejudice.  *See Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) (explaining that it is "the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial"); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction.").  Plaintiffs are free to address

this question as well within the next ten days.  No further briefing on these issues will be allowed unless expressly invited by the court.

## III.  Intervenor's Declaratory Judgment Claim

Finally, the court addresses CIC's motion.  The court could decline to exercise its supplemental jurisdiction over this claim as well, but as already explained above, the record establishes that Kelemen was acting outside of the scope of his employment, and therefore also outside the definition of "insured" under the policy.  *See Groce*, 193 F.3d at 502 (explaining that a court may depart from the "usual practice" and continue to exercise supplemental jurisdiction over "'doomed litigation' that will only be dismissed once it gets there" for lack of merit); *see also In re Repository Tech., Inc.*, 601 F.3d 710, 725 (7th Cir. 2010) (noting that the district court retains supplemental jurisdiction "because it invades no state interest–on the contrary, it spares overburdened state courts additional work that they do not want or need–for the federal court to dismiss the claim on the merits, rather than invite a further, and futile, round of litigation in the state courts").

To determine whether a duty to defend and cover exists, the court first determines whether the insurance policy "makes an initial grant of coverage -- i.e., whether the insurer has a duty to indemnify its insured -- for the claims asserted."  *Estate of Sustache v. Am. Family Mut. Ins. Co.*, 2008 WI 87, ¶ 22, 311 Wis. 2d 548, 751 N.W.2d 845.  If the court finds an initial grant of coverage, the court then "examine[s] the policy's exclusions to determine whether they preclude coverage."  *Id.* at ¶ 23.  If an exclusion is found to apply, the court then "look[s] to see whether any exception to that exclusion reinstates

coverage." *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 24, 268 Wis. 2d 16, 673 N.W.2d 65.

CIC asserts two bases in support of its argument that it has no duty to defend or cover the claims asserted against Kelemen.  As already discussed, CIC contends that the acts giving rise to Luce's First Amendment retaliation and state law claims, Kelemen must have been acting within the scope of his employment or authority.  Since the court has found he was not, Kelemen was not an "insured" as defined by the policy.  Even if Kelemen were to qualify as an insured under the policy, his alleged acts constitute willful violation of penal statutes, and therefore fall within a Policy exclusion.  The court need not take up CIC's second argument, because the record establishes as a matter of law that Kelemen was acting outside of the scope of his employment when he signed Luce up for various websites and posted comments about him online.

In pertinent part, the policy limits "insured" to employees "acting within the scope of their employment or authority."  (Bisek Aff., Ex. A (dkt. #36-1) p.15.)  Relying on the Restatement (Second) of Agency, the Wisconsin Supreme Court has defined scope of employment as

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits; [and]
>
> (c) it is actuated, at least in part, by a purpose to serve the master
>
> . . .

*Olson v. Connerly*, 156 Wis. 2d 488, 499, 457 N.W.2d 479, 483 (1990).   Similarly, "[c]onduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."  *Id.*

At least at times when he was gathering Luce's information and signing him up for websites, it is undisputed that Kelemen was on the clock.  Kelemen has also raised a genuine issue of material fact, if barely, by contending that he engaged in these acts, at least in part, to serve the Town, supposedly in an attempt to "distract" Luce.  Still, Kelemen has failed to raise a genuine issue of material fact as to whether his conduct is "the kind he is employed to perform."  Indeed, as mentioned already, Kelemen admitted at his deposition that the actions he took were his own and not in his capacity as a law enforcement officer.  (12/19/14 Kelemen Depo. (dkt. #56) 202-206 (Question: "Is it your contention that you were acting as the Chief of Police for the Town of Campbell when you posted insults about Mr. Luce on the La Crosse Tribune website?"  Answer: "I would say that I was acting on my own."; admitting that signing Luce up for websites was inconsistent "with the rules [his] employer expected [Kelemen] to abide by" and was not done "to enforce any law").  To the contrary, Kelemen's misconduct falls woefully short of the minimum professionalism and detachment one should reasonably expect of a police officer, much less a Chief of Police.

Kelemen's response to CIC's argument is flimsy at best.  First, Kelemen points to his belief that the conduct was not a violation of any criminal statute.  (Kelemen's Opp'n (dkt. #82) 6.)  Even assuming this belief was reasonable, it utterly fails to support a

finding that he was acting with the scope of his employment -- not all *non*-criminal actions are within the scope of his employment and authority -- especially in light of his admissions to the contrary.  Second, Kelemen argues that he was acting in his employer's interest in engaging in these acts.  (*Id.* at 7.)  Once again, this argument misses the mark.  Kelemen could have "occup[ied]" Luce's time in any number of ways which would have fallen outside of the scope of his employment (e.g., by holding him hostage).  It is not enough for an employee to believe he was acting in the interest of his employer for his conduct to fall within the scope of his employment.

Based on Kelemen's own admissions, the conduct underlying Luce's First Amendment retaliation and state law claims is not the kind Kelemen was employed or authorized to perform.  As such, the court will grant CIC's motion for summary judgment, and enter a declaratory judgment that CIC has no duty to defend or cover Luce's claims specific to Kelemen.


ORDER

IT IS ORDERED that:

1) Defendant the Town of Campbell, Wisconsin's motion for summary judgment (dkt. #60) is GRANTED.

2) Defendant Tim Kelemen's motion for summary judgment (dkt. #65) is GRANTED as to plaintiffs Gregory Luce and Nicholas Newman's First Amendment free speech and freedom of assembly claims (first and second causes of action in the amended complaint) and RESERVED in all other respects.

3) Intervening defendant Community Insurance Corporation's motion for summary judgment (dkt. #70) is GRANTED and judgment shall be entered

DECLARING that CIC has no duty to defend or cover claims asserted by Luce against defendant Kelemen.

4) Plaintiffs Gregory Luce and Nicholas Newman's motion for summary judgment (dkt. #75) is DENIED with respect to plaintiffs' First Amendment free speech and freedom of assembly claims (first and second causes of action in the amended complaint) and RESERVED in all other respects.

5) On or before June 26, 2015, plaintiff Luce should submit a proffer as to why the court should not grant judgment in favor of defendant Kelemen on plaintiff's First Amendment retaliation claim because Kelemen is not acting under color of state law as required under 42 U.S.C. § 1983.

Entered this 16th day of June, 2015.

BY THE COURT:

/s/
_____
William M. Conley
District Judge